STATE, EX REL. WALTER CHAMBERLIN ET·AL., APPELLEES, V.
JOHN H. MOREHEAD ET AL., APPELLANTS.

FILED DECEMBER 23, 1915.  No. 19406.

Banks and Banking: SAVINGS BANK: CHARTER: DISCRETION. Article
   I, ch. 6, Rev. St. 1913, the Nebraska banking act, construed,
   and *held* to vest the banking board with discretionary power to re-
   fuse a charter for a savings bank when it appears that the proposed
   bank is to be conducted in the same room, or in a room immediately
   adjacent to a room, occupied by a national bank, and the officers
   and directors of the two banks will be substantially the same
   persons.

APPEAL from the district court for Lancaster county:
ALBERT J. CORNISH, JUDGE. *Reversed and dismissed.*

*Willis E. Reed, Attorney General,* and *Charles S. Roe,*
for appellants.

*W. T. Thompson, contra.*

MORRISSEY, C. J.

Relators made application to the state banking board
for a charter for a savings bank, to be known as the State
Savings Bank of Clarks, Nebraska. The preliminary
steps provided by the statute were taken in due form, and
no objection was raised as to the character of the parties,
their financial ability, or the form of the application, but
the banking board ascertained that, if the charter were
granted the relators intended to conduct the business of
the state savings bank in the same room, or in a room
immediately adjacent to the room, occupied by the First
National Bank of Clarks, and that the officers and direc-
tors of the two banks would be the same persons, or prac-
tically so. Some time preceding this application, the
banking board had before it a similar application, which
it rejected, after adopting a resolution declaring it unwise,
unsafe, and against public policy to permit the operation
of banks as relators proposed, and declaring it the fixed

policy of the board that, in the future, charters under such circumstances would not be granted. On consideration of relators' application the board adhered to its policy theretofore announced and refused to issue a charter.

This action was then commenced in the district court for Lancaster county, and, on hearing, a writ of mandamus issued. directing respondents to forthwith convene, approve the articles of incorporation, and issue the charter as prayed. Respondents have appealed. No question of fact is in dispute. But we are called upon to determine whether the board had discretionary power to refuse to grant the charter under the provisions of the banking act.

By the Nebraska banking act, article I, ch. 6, Rev. St. 1913, banking is declared to be a quasi-public business, subject to regulation and control by the state, and it is made unlawful to engage in this business, except by means of a corporation duly organized for that purpose. The act creates a banking board, giving it general supervision and control of all banks coming within its provisions. It is made the duty of the governor to appoint a secretary for the board, and examiners, who are empowered "to make a thorough examination into all the books, papers and affairs of any corporation transacting a banking business in this state." Section 8. These examiners are empowered to summon witnesses and administer oaths, and it is made their duty to make a detailed report to the banking board. If, upon examination, a bank is found to be insolvent, "or is conducting its business in an unsafe or unauthorized manner, or is endangering the interest of its depositors, then such examiner shall have full power and authority to hold and retain possession of all the money, rights, credits, assets, and property of every description belonging to such bank, * * * until the state banking board can receive and act on the report made by the examiner of said bank, and have a receiver appointed as hereinafter provided." Section 10. There is further provision for the issuance of a certificate stating that the banking corporation has complied with the laws of this state for the

protection of bank depositors, and that the depositors are protected by the depositors' guarantee fund, and that every banking corporation receiving such certificate shall conspicuously display the same in its place of business, and "may print or engrave upon its stationery words to the effect that its depositors are protected by the depositors' guarantee fund of the state of Nebraska." Section 16 provides that, after the parties have taken the preliminary steps which relators took in this case, "then the state banking board, if, upon investigation, it shall be satisfied that the parties requesting said charters are parties of integrity and responsibility, shall  *  *  *  issue to said corporation the certificate provided for in section 14 and a charter to transact the business provided for in its articles of incorporation."

Relators contend that this provision is mandatory; that, it being admitted that the parties had complied with all the terms of the act and are men of integrity and responsibility, the board has no power to inquire further into the manner or method of doing business. This is evidently the view taken by the district court, and the section, standing alone, may bear that construction. But the statute on banking is a complete and comprehensive act. It was enacted by the legislature of 1909 after it had been drafted by able lawyers, selected specially for that purpose, and after the fullest discussion and most careful research. Its purpose cannot be questioned. It aimed to take the banking business out of private hands and place it under state control, to the end that failure might be made unlikely and a general panic almost impossible. And its right to do so under the police power has been upheld by the supreme court of the United States. *Shallenberger v. First State Bank of Holstein*, 219 U. S. 114. The act provides not alone for the investigation that is to be made under section 16, before the issuance of a charter, but for a continuing supervision. Banks operated under the provisions of the act are required to carry a certain reserve, and it is provided that no part of said

reserve fund shall be kept in any depository which, in the opinion of the state banking board, would not be a proper and safe custodian thereof. The board is authorized to call upon the bank, in case its reserve falls below the proper amount, to make good the deficiency, and its failure is made cause for the appointment of a receiver. The act fixed a maximum rate of interest; two or more banks transacting business in the same city are forbidden to use the same name, or names so nearly alike as to cause confusion in transacting business, and, in case such condition did exist at the time the act became effective, the board is empowered to require such change or modification as will prevent the confusion.

Section 44 provides: "For the purpose of providing a guarantee fund for the protection of depositors in banks, every corporation engaged in the business of banking under the laws of this state shall be subject to assessment to be levied, kept, collected and applied as hereinafter provided." By subsequent provisions, the banking board is authorized to make such adjustment of rates and assessments to be paid by any bank engaging in business as will require such bank to contribute to the depositors' guarantee fund a just and equitable sum, and all banks are required to set apart, keep, and maintain the amount thus fixed and levied; the same to be payable to the state banking board on demand. It is further provided that if the depositors' guarantee fund be depleted, or reduced below a certain amount, the state banking board shall make a special assessment against the capital stock of each of the banks covered by the banking act. Section 49 provides: "Whenever it shall appear to the state banking board, from any examination or report provided for by this article, that the capital of any corporation transacting a banking business under this article is impaired, or that such corporation is conducting its business in an unsafe or unauthorized manner, or is endangering the interests of its depositors," the banking board shall proceed to secure the appointment of a receiver to

wind up its affairs. If it may do this with a bank that is a going concern, why not, before the issuance of a charter, take precautions to see that the business of the corporation will be conducted in a safe manner and that the interests of the depositors will be fully protected.

Upon the failure of any bank to pay its depositors in full, the guarantee fund, under the direction of the banking board, immediately becomes available for such purpose, and, as all of the banks operated under the jurisdiction of the banking board contribute to this fund, directly or indirectly, its conservation affects all of the depositors in these banks. Again, it may be said that when two banks are conducted in the same room, and managed by the same people, depositors may easily be mistaken as to which bank has their account. They may believe that it is deposited under the provisions of this act, while in reality their account is carried in the other bank. Again, it may complicate examinations. National banks are not subject to examination by the state examiners. State banks are not under the control of the federal government, nor subject to examination by its examiners. Experience has shown that, where the banking business is conducted as proposed by the relators, it is easy to transfer funds from one bank to another. If one of the banks finds itself in straitened circumstances, the temptation is great to draw on the other bank to tide it over an examination. Indeed, it is stipulated in the record that, in the year 1913, where a national bank and a state savings bank were conducted under conditions such as are proposed, the failure of the national bank caused the failure of the state bank with a loss to the guarantee fund in the sum of $54,000.

If standing alone and construed literally, section 16 might bear the interpretation for which relators contend. But, in addition to the provisions already pointed out, section 60 reads: "The state banking board shall prescribe all such forms as may be useful or necessary in carrying out the provisions of this article, and shall have power to make such rules and regulations, not inconsis-

tent with the provisions of this article, as may be necessary or proper to carry it into effect according to its true intent." When the general rule of statutory construction is applied and section 16 is considered in connection with the other provisions, it must be held that the board is vested with authority not only to correct evils that may creep into the management of an existing bank, but to guard against dangers that may threaten institutions about to be formed. "The power to compel, beforehand, co-operation, and thus, it is believed, to make a failure unlikely and a general panic almost impossible, must be recognized, if government is to do its proper work, unless we can say that the means have no reasonable relation to the end." *Noble State Bank v. Haskell,* 219 U: S. 104, 112. To give section 16 the construction asked by relators would be to narrow, if not to nullify, the provisions of the act vesting the board with power to take all steps necessary for the proper regulation of the banking business.

If the guarantee fund does not directly guarantee the deposits in the national bank, yet the fact that in the same room, or in the room adjacent, the same parties are operating a state bank under the guarantee fund, may lead the general public to believe that the money deposited in the national bank is also guaranteed. We think the intention of the legislature was to vest the banking board with general control and with authority to do all things reasonably necessary for the protection of depositors throughout the state. The board also stands in the nature of a trustee for this guarantee fund, and it is its duty to take such precautions as may be necessary to protect its integrity. The terms "general supervision and control" vest the banking board with duties of. a very high order, and they are not to be perfunctorily discharged, but to be administered with the highest degree of intelligence and discretion.

It is customary for legislatures to grant to administrative bodies of this character the power to adopt rules, bylaws, and regulations reasonably necessary to carry out the

purpose for which they are created, and this grant is not an improper delegation of authority. *Blue v. Beach,* 155 Ind. 121, and cases cited. This is held generally to be the rule in matters coming within the police power of the state. That the banking business comes within that power is no longer an open question. "The police power extends to all the great public needs (*Camfield v. United States,* 167 U. S., 518) and includes the enforcement of commercial conditions such as the protection of bank deposits and checks drawn against them by compelling co-operation so as to prevent failure and panic." *Noble State Bank v. Haskell, supra.*

The business of banking coming within the police power of the state, the same rule of construction may be applied to banking acts and to rules and regulations established by banking boards as applies to acts creating other administrative bodies coming within the police power. The supreme court of judicature of Indiana, in discussing this phase of the question, in *Blue v. Beach, supra,* say: "While it is true that the character or nature of such boards is administrative only, still the power, conferred on them by the legislature, in view of the great public interests confided to them, have always received from the courts a liberal construction, and the right of the legislature to confer upon them the power to make reasonable rules, by-laws, and regulations, is generally recognized by the authorities."

In that case the court was discussing rules and regulations made to protect the public health, but these rules and regulations are made under the police power of the state, and the same rule may reasonably be applied to all boards acting within that power. The rule adopted and followed by the banking board appearing to be a reasonable and salutary one, its action will not be disturbed. The judgment of the district court is reversed and the cause dismissed.

REVERSED AND DISMISSED.

ROSE, J., not sitting.